**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHELLE WOLKOMIR, Derivatively On Behalf Of TYSON FOODS, INC., | Case No.:    21-1043 |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| vs. | |
| JOHN H. TYSON, BARBARA TYSON, DEAN BANKS, NOEL WHITE, DAVID J. BRONCZEK, LES R. BALEDGE, GAURDIE E. BANISTER, MIKE BEEBE, MIKEL A. DURHAM, JONATHAN D. MARINER, KEVIN M. MCNAMARA, CHERYL S. MILLER, JEFFREY K. SCHOMBURGER, ROBERT THURBER, AND STEWART GLENDINNING, | **JURY DEMANDED** |
| -and- | |
| Defendants, | |
| -and- | |
| TYSON FOODS INC, | |
| Nominal Defendant. | |

Plaintiff Michelle Wolkomir ("Plaintiff"), by and through her undersigned counsel, derivatively on behalf of Nominal Defendant Tyson Foods, Inc. ("Tyson" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon her personal knowledge as to herself and her own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Tyson with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference

transcripts, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Tyson's directors and officers from March 13, 2020 through the present (the "Relevant Period").

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action (defined below) based on violations of the Exchange Act.

3.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

4.      Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

5.      *Plaintiff Michelle Wolkomir* ("Plaintiff") acquired the Company securities and will continue to hold Tyson shares throughout the pendency of this action.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

6.      *Nominal Tyson* is purportedly the largest U.S. producer of processed chicken, beef, pork, and protein-based products.  The Company is incorporated in Delaware and its head office is located at 2200 Don Tyson Parkway, Springdale, AR 72762-6999.  Tyson shares trade on the New York Stock Exchange ("NYSE") market under the ticker symbol "TSN."

### Director Defendants

7.      *Defendant John H. Tyson* ("J. Tyson") has served as a director since 1984 and has served as Chairman of the Board of Directors ("Board") since 1998.  Defendant J. Tyson also served as Chief Executive Officer ("CEO") of Tyson from 2000 until 2006.   Defendant J. Tyson is the grandson of the founder of the Company, has been part of the Company since he was a teenager, and has worked in almost every department.  Defendant J. Tyson also has a substantial personal and financial interest in the Company through his association with the Tyson Limited Partnership, the Company's controlling shareholder, and his individual shareholding interests.

8.      *Defendant Barbara Tyson* ("B. Tyson") has served as a director since 1988. Defendant B. Tyson also served as Vice President of the Company until 2002, when she retired and became a consultant to Tyson.  Defendant B. Tyson stopped serving as a consultant in 2011. Defendant B. Tyson is the aunt of Defendant J. Tyson and has a substantial personal interest in the Company as the sole income beneficiary of the BT 2015 Fund, a limited partner of the Tyson

Limited Partnership.

9.     **Defendant Dean Banks** ("Banks") has served as the Company's President and CEO since October 3, 2020.  Defendant Banks has also served as President since December 20, 2019 and has been a member of the Board since 2017.

10.     **Defendant Noel White** ("White") has served as the Company's Executive Vice Chairman of the Board since October 2020 and as a Company director since 2018.  Defendant White also served as CEO and as President of the Company from September 2018 until October 2020 and December 2019, respectively.

11.     **Defendant David J. Bronczek** ("Bronczek") has served as a director since May 2020.

12.     **Defendant Les R. Baledge** ("Baledge") has served as a director since February 2020.

13.     **Defendant Gaurdie E. Banister Jr.** ("Banister") has served as a director since 2011.

14.     **Defendant Mike Beebe** ("Beebe") has served as a director since 2015.

15.     **Defendant Mikel A. Durham** ("Durham") has served as a director since 2015.

16.     **Defendant Jonathan D. Mariner** ("Mariner") has served as a director since 2019.

17.     **Defendant Kevin M. McNamara** ("McNamara") has served as a director since 2007.

18.     **Defendant Cheryl S. Miller** ("Miller") has served as a director since 2016.

19.     **Defendant Jeffrey K. Schomburger** ("Schomburger") has served as a director since 2016.

20.     Defendant **Robert Thurber** ("Thurber") has served as a director since 2009.

21.     Defendants J. Tyson, B. Tyson, Banks, White, Bronczek, Baledge, Banister, Beebe,

Durham, Mariner, McNamara, Miller, Schomburger and Thurber are herein referred to as "Director Defendants."

**Officer Defendant**

22.     ***Defendant Stewart Glendinning*** ("Glendinning") has served as the Executive Vice President and Chief Financial Officer ("CFO") of the Company since February 2018, after serving as an Executive Vice President since December 2017.

23.     The Director Defendants and Defendant Glendinning are collectively referred to herein as "Defendants".

**THE COMPANY'S CORPORATE GOVERNANCE**

24.     As members of Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

25.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Tyson, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company

**DUTIES OF THE DIRECTOR DEFENDANTS**

26.     By reason of their positions as officers, directors, and/or fiduciaries of Tyson and because of their ability to control the business and corporate affairs of Tyson, the Director Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Tyson in a fair, just, honest, and equitable manner.  The Director Defendants were and are required to act in furtherance of the best interests of Tyson and its shareholders.

27.     Each director and officer of the Company owes to Tyson and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

28.     The Director Defendants, because of their positions of control and authority as directors and/or officers of Tyson, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with Tyson, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of Tyson.

29.     To discharge their duties, the officers and directors of Tyson were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Tyson were required to, among other things:

(a)     Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     Conduct the affairs of the Company in an efficient, businesslike manner so

as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)    Remain informed as to how Tyson conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)    Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)    Ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

30.    Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Tyson, the absence of good faith on their part, and a reckless

disregard for their duties to the Company and its shareholders that the Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

31.    The Director Defendants breached their duties of loyalty and good faith by causing the Company to misrepresent the information as detailed *infra*.  The Director Defendants' subjected the Company to the costs of defending, and the potential liability from, the securities class action (and related lawsuits).  As a result, Tyson has expended, and will continue to expend, significant sums of money.

32.    The Director Defendants' actions have irreparably damaged Tyson's corporate image and goodwill.

## BACKGROUND

33.    In December of 2019, a novel coronavirus strain, now called COVID-19, was detected in the city of Wuhan in Hubei province, China.  Since then, the virus has spread to numerous countries.

34.    COVID-19 was detected in the U.S. as early as January 20, 2020.  Since then, the disease has gone on to claim more than 500,000 American lives.

35.    On February 6, 2020, the Company submitted a form 10-Q for the quarter ended December 28, 2019 ("3Q 2019 10-Q").  In the 3Q 2019 10-Q, the Company states: "[W]e are monitoring the potential impact of the novel coronavirus outbreak to our global business."  As such, as early as February 6, 2020, the Company were aware of the risks that the coronavirus posed to their business.

## THE COVID-19 WORKING CONDITION MISCONDUCT

36.    The Company's response to the pandemic was insufficient to care for its workers and ensure production.

37.    The federal government published guidelines regarding social distancing and personal protective equipment ("PPE") on March 9, 2020.  While the rest of the country was taking precautions to prevent the spread of COVID-19, the Company did little in response to the pandemic in March and early April 2020 to protect its workers and keep plants safely operating.

38.    In March 2020, the Company took minor superficial steps towards protecting its employees by temporarily relaxing its punitive attendance policies, paying for workers' COVID-19 tests, and taking employee temperatures (though fever is not always a symptom of the virus).[1]

39.    The Company did not make any serious changes until the public and media found out that COVID-19 was quickly spreading in the meatpacking industry.  The Retail, Wholesale and Department Store Union ("RWDSU") wrote in an article on April 7, 2020, that it had been imploring employers like Tyson over the past month to implement measures to protect workers and secure the food supply chain.  The RWDSU called out Tyson, which had a facility in Camilla, Georgia where the RWDSU represented 2,000 members.  Two employees there had died, and many others were sick or in quarantine.  The article further explained the conditions at the facilities, and noted other areas that were affected:

> Tyson employs a largely black workforce that commutes from Albany, Georgia and surrounding cities to the facility daily.  ***Workers debone chickens elbow to elbow with no access to masks***. They work at speeds of upwards of 80 chickens per minute, while upper management, largely white and clad in protective gear, oversees production.
>
> Sadly Camilla, Georgia, isn't the only place affected. ***Shelbyville, Tennessee; Carthage, Mississippi; and other communities across the South are suffering due to Tyson's delayed distribution of personal protective equipment (PPE) to workers and the delayed implementation of social distancing protocols, protective barriers, and staggered start times and breaks***.  Perhaps most astonishing, the company offered workers a $500 bonus, but the bonus is tied to attendance and

---

[1]    Alice Driver, Arkansas poultry workers amid the coronavirus: 'We're not essential, we're expendable', *Arkansas Times* (May 11, 2020), available at https://arktimes.com/arkansas-blog/2020/05/11/arkansas-poultry-workers-amidthe-coronavirus-were-not-essential-were-expendable. Last visited February 25, 2021.

won't be paid out until July.  Workers deserve a no-strings attached bonus now and premium pay for the additional risks to their health and the health of their families as they ensure continuity of our nation's food supply for all of our families.

While the company has pledged to do better and has started this week to share PPE with workers, put up protective barriers at some facilities, and pledged to pay union workers for time in quarantine, the fact is it's too little too late.  Workers are dying. This is inexcusable for America's largest meat producer, which makes $40 billion in annual revenue. Yet, Tyson is just one example of an industry that is acting too late to protect a generation of workers that is feeding America during this crisis. [Emphasis added].

40.    The Company took some minimal steps, but still allowed workers to wear bandanas or sleep masks as face coverings, which are not recommended as protective devices by the CDC. For example, at a Company pork plant in Iowa, local officials and workers said that some employees were using bandanas and sleep eyewear as facial coverings, while others wore no facial coverings at all, and there was little evidence of social distancing.[2]

41.    However, the Company did not require masks until April 15, 2020, and never moved workers six feet apart throughout the plant or slowed down the assembly line so that employees could socially distance.[3]  The Company did not actually provide workers with masks until April 23, 2020.[4]

42.    Because the Company provided just one mask a day, one worker reported that she had to clean and reuse her masks since they would get splattered with chicken blood.[5]  The Company hung some plastic sheets between workers, but workers continued to work side by side,

---

[2]    Taylor Telford and Kimberly Kindy, As they rushed to increase the U.S. meat supply, big processors saw plants become COVID-19 hot spots, *The Washington Post* (Apr. 25, 2020), https://www.washingtonpost.com/business/2020/04/25/meat-workers-safety-jbs-smithfield-tyson.    Last visited February 25, 2021.
[3]    *Id.*
[4]    Magaly Licolli, Op-ed: As Tyson Claims the Food Supply is Breaking, Its Workers Continue to Suffer, *Civil Eats* (April 30, 2020), https://civileats.com/2020/04/30/as-tyson-claims-the-food-supply-is-breaking-its-workerscontinue-to-suffer/.  Last visited February 25, 2021.
[5]    Driver, *supra.*

although the CDC has stated that plastic sheeting does not protect from COVID-19 without social distancing. Indeed, one worker explained that employees were so close that they were "stuck together."[6]

43.    In addition, the Company would not tell employees about known cases of COVID-19 among coworkers.[7] According to a contractor at the Company's plant in Independence, Iowa, workers there would get in trouble for warning others about being exposed to cases of COVID-19.[8]

44.    On April 22, 2020, a worker-led organization that advocates for the rights of poultry workers in Arkansas, brought a petition to one of the Company's plants in Springdale. Almost 200 Tyson workers demanded better benefits for workers, including full paid sick leave, and greater transparency about known COVID-19 cases.[9] The Company then announced that workers with COVID-19 would receive short-term disability wages equivalent to 90 percent of their normal pay, rather than a lower rate.

45.    In the meantime, the Company successfully lobbied the federal government and local officials to classify meat processing as "essential" under the Defense Production Act and keep its plants open.[10] On April 26, 2020, the Company took out full-page advertisements in the *New York Times*, *Washington Post*, and *Arkansas Democrat-Gazette*, warning that "the [American] food supply chain is breaking." Defendant J. Tyson wrote:

> As pork, beef and chicken plants are being forced to close, even for short periods of time, millions of pounds of meat will disappear from the supply chain. As a result, there will be limited supply of our products available in grocery stores until

---

[6]     *Id.*
[7]     *Id.*
[8]     Telford and Kindy, *supra*.
[9]     Driver, *supra*.
[10]    H. Claire Brown, Families of three workers who died of Covid-19 sue Tyson for allegedly lying about outbreak, *The Counter* (June 29, 2020), https://thecounter.org/tyson-meatpacking-workers-covid-19-lawsuit-waterloo/. Last visited February 25, 2021.

we are able to reopen our facilities that are currently closed.

46.     Further, in June 2020, the Company reinstated its pre-pandemic absentee policy that punished employees for missing work due to illness—or missing work due to fear of exposure.[11] Workers who showed up for every scheduled shift for three months would receive a $500 thank you bonus.[12]

47.     Although the Company eventually created outdoor break room spaces to purportedly combat overcrowding, employees were still restricted from using the bathroom due to space limitations.[13]

### WRONGFUL DEATH, COVID-19 LITIGATION AND GOVERNMENT SCRUTINY

48.     The Company's poor COVID-19 response took a grave toll on human life.  In May 2020, the family of a meat cutter who died of COVID-19 filed a wrongful death lawsuit against the Company, claiming that the Company had failed to provide the employee with protective equipment.[14]  Also, in May 2020, the family of a Tyson employee at a Texas facility filed a wrongful death lawsuit against the Company, claiming that it had failed to provide a safe work environment during the pandemic.[15]  The lawsuit specifically alleged that the Company failed to maintain social distancing between workers, provide protective gear, tell sick workers to stay home, take workers' temperatures, or shut down the plant for a limited time.

49.     In June 2020, the families of three workers at the Waterloo, Iowa pork processing facility (the Company's largest pork plant, which was linked to over a thousand cases of COVID-

---

[11]     Deena Shanker and Jen Skerritt, Tyson reinstates policy that penalizes absentee workers, *Bloomberg* (June 3, 2020), https://www.detroitnews.com/story/business/2020/06/03/tyson-reinstates-policy-penalizes-absenteeworkers/111902502/. Last visited February 25, 2021.
[12]     Brown, *supra*.
[13]     Licolli, *supra*.
[14]     *Le et al v. Tyson Foods Inc.*, 2:20-cv-00131 (May 21, 2020).
[15]     *Chavez et al v. Tyson Foods, Inc.*, 9:20-cv-00134 (filed May 18, 2020 and removed to Eastern District of Texas on June 15, 2020).

19) who died of COVID-19, filed a wrongful death lawsuit claiming that managers lied to employees about the spread of COVID-19 at the plant, that the Company failed to institute adequate safety measures, and that supervisors allowed or encouraged sick or symptomatic workers to keep working (the "Waterloo Lawsuit").[16]  The Waterloo Lawsuit names defendants Tyson, J. Tyson, White, and Banks as defendants, and alleges that the Company's officials knew COVID-19 was spreading at Waterloo plant by late March or early April of 2020, but did not tell employees and the public.

50.    The Waterloo Lawsuit further alleges that "[o]n or about April 20, 2020, Governor [Kim] Reynolds held a conference call with the CEO of Tyson Foods, other high-ranking Tyson officials, and Tyson lobbyist Matt Eide.  On information and belief, Tyson officials downplayed the seriousness of the COVID-19 outbreak at the Waterloo Facility and exaggerated the efficacy of safety measures implemented at the facility."

51.    In September 2020, the family of an employee of Tyson Fresh Meats (a subsidiary of Tyson) in Texas brought another lawsuit alleging that the employee contracted the virus because of exposure at a Tyson plant.[17]  That employee allegedly worked elbow-to-elbow with coworkers, was not provided with protective gear, and saw no efforts at social distancing.  The lawsuit also alleged that appropriate cleaning was not implemented, there was no training regarding virus prevention, employees were not properly screened, production was not slowed, there was inadequate testing and contact tracing, and employees did not know that other coworkers in their proximity had tested positive.  Moreover, the lawsuit alleged that the Company flouted state and

---

[16]    *Buljic et al v. Tyson Foods, Inc. et al*, 6:20-cv-02055 (removed from Black Hawk County, Case No. LA-cv-140521 on July 27, 2020 to the Northern District of Iowa).  References to the "Waterloo Complaint" are to the second amended complaint filed December 9, 2020 (Doc. No. 46).
[17]    *Cano et al v. Tyson Foods, Inc. et al*, 3:20-cv-00094 (filed Sept. 23, 2020, removed to Southern District of Iowa November 19, 2020).

federal rules, regulations and guidance regarding the reduction and prevention of the spread of COVID-19.

52. The Company announced on June 26, 2020 that 371 of the 1,142 employees at the plant in Noel, Missouri had tested positive for COVID-19.[18] There have been numerous other outbreaks at Tyson's many facilities.[19]

53. In November 2020, the Company suspended top officials at the Waterloo pork plant and launched an investigation into allegations that they bet on how many workers would get infected with COVID-19.[20] Defendant Banks said in a public statement issued by Tyson that he was "extremely upset" about the allegations and that Tyson retained the law firm Covington & Burling LLP to conduct an investigation, led by former U.S. Attorney General Eric Holder (the "Holder Investigation").[21] In December, following the investigation, Tyson fired seven managers at the Waterloo plant.

54. As of December 2020, the Company had more than three times as many COVID-19 cases as the next company—the highest number of COVID-19 cases in the meatpacking industry—and twice as many COVID-19 deaths as any other meatpacking company.[22]

**Plant Closures**

---

[18] AP News, Tyson Foods: 371 positive COVID-19 tests at Missouri plant (June 27, 2020), https://apnews.com/article/d3646ba688a79eba78db3bcabee80b24. Last visited February 25, 2021.

[19] Carolyn Casey, COVID-19 Outbreaks at Tyson Foods Plants Sicken Nearly 5,000 Workers, *Expert Institute*, https://www.expertinstitute.com/resources/insights/covid-19-outbreaks-at-tyson-foodsplants-sicken-nearly-5000-workers/. Last visited February 10, 2021.

[20] Ryan J. Foley, Tyson suspends Iowa plant managers amid virus betting claim, *AP News* (Nov. 19, 2020), https://apnews.com/article/iowa-tyson-plant-managers-virus-bet-law-f9a4556fdd253a7ae1787039e248879a. Last visited February 25, 2021.

[21] Tyson Foods Issues Statement on Waterloo Lawsuit Allegation (Nov. 19, 2020), https://www.tysonfoods.com/news/news-releases/2020/11/tyson-foods-issues-statement-waterloo-lawsuitallegations. Last visited February 25, 2021.

[22] Food and Environment Reporting Network, Mapping Covid-19 outbreaks in the food system, https://thefern.org/2020/04/mapping-covid-19-in-meat-and-food-processing-plants/. Last visited February 25, 2020.

55.     The Company's careless response also led to disruptions to production, including plant closures.

56.     In a letter to the Company dated April 17, 2020, local Iowa officials warned Tyson that the "outbreak at a facility of your size puts great risk to the safety and well-being [of] all residents in our community, especially the elderly and vulnerable." Tyson's Waterloo, Iowa pork plant was closed from April 22, 2020 to May 6, 2020 after over 180 infections were linked to the plant, and a pork plant in Logansport, Indiana was closed. Local Black Hawk County Sheriff Tony Thompson, who had visited the Waterloo plant, stated:

> We walked into that plant and some people are wearing homemade masks, some people are wearing bandannas, and some people aren't wearing anything . . . They're working elbow-to-elbow. Some are reaching over the top of others on the food production lines. They deep clean once a night. They felt like they were doing a good job, and we walked out of there thinking, "Oh my goodness, if this is the bare minimum, this isn't enough."

57.     On April 23, 2020, the Company closed a beef facility in Pasco, Washington, indefinitely, for workers to undergo COVID-19 testing.[23]

58.     The Company closed its Storm Lake, Iowa plant in late May 2020, because over 20% of the workers there tested positive for COVID-19.[24] The Company resumed limited production at that facility on June 3, 2020, but also confirmed that 224 of its 1,483 employees at its Council Bluffs, Iowa plant had tested positive for COVID-19.[25] In Wilkesboro, North Carolina in early May 2020, production was suspended for two days at one of two plants for deep cleaning and sanitizing, but, county officials said that a majority of the county's COVID-19 case were

---

[23]     Marisa Fernandez, Tyson Foods closes another meat plant indefinitely due to coronavirus, *Axios* (April 23, 2020), https://www.axios.com/tyson-foods-plant-coronavirus-5890f52c-cd31-497e-a859-d2a0b59d0c31.html. Last visited February 25, 2021.

[24]     Olivia Rosane, Tyson Pork Plant Closes After More Than 20% of Workers Test Positive for COVID-19, *EcoWatch* (May 29, 2020), https://www.ecowatch.com/tyson-pork-plant-closes-coronavirus-2646123888.html?rebelltitem=2#rebelltitem2. Last visited February 25, 2021.

[25]     Shanker and Skerritt, *supra*.

linked to an outbreak at the Company.[26]

59.    In June 2020, China stopped importing from a Tyson chicken plant in Springdale, Arkansas because of outbreaks of COVID-19.[27]

**Government Reaction to Tyson's Response to COVID-19**

60.    President Biden, who the *Associated Press* named the winner of the 2020 presidential election on November 7, 2020, has made responding to COVID-19 a top priority and would likely enforce stricter laws than the previous administration.  The "Biden Plan to Combat Coronavirus (Covid-19) and Prepare for Future Global Health Threats," stated that the administration plans to:

> Direct the Occupational Safety and Health Administration (OSHA) to keep frontline workers safe by issuing an Emergency Temporary Standard that requires health care facilities to implement comprehensive infectious disease exposure control plans; ***increasing the number of OSHA investigators to improve oversight***; and working closely with state occupational safety and health agencies and state and local governments, and the unions that represent their employees, to ensure comprehensive protections for frontline workers.  [Emphasis added].

61.    President Biden himself called out the meatpacking industry, stating at a town hall on May 19, 2020, that:

> Whether it's cattle, whether it's beef, whether it's pigs, whether it's chicken, they're moving down that line faster and faster and faster to increase the profit rate. People are getting sicker. People are getting hurt.  The very thing we should be doing now is making sure these people are protected.  That they have space 6 feet apart, that they have shields around them, slow the process up.  Make sure they have the protective gear, make sure they are being taken care of.

62.    President Biden emphasized that "no worker's life is worth me getting a cheaper

---

[26]    Virginia Bridges, Tyson Foods closes Wilkes County plant for deep cleaning amid coronavirus outbreak, *The News & Observer* (May 9, 2020), https://www.newsobserver.com/news/coronavirus/article242625836.html.  Last visited February 25, 2021
[27]    *Arkansas Democrat-Gazette*, State plant's poultry halted by China (Sept. 17, 2020), available at https://www.arkansasonline.com/news/2020/sep/17/state-plants-poultry-halted-by-china/.    Last visited February 25, 2021.

hamburger.  No workers life is worth that.  That's what the hell's happened here."

63.    On June 22, 2020, Senators Elizabeth Warren and Cory Booker sent a letter to Defendant White and other meatpacking executives, questioning "how seriously Tyson takes its 'responsibility to feed our country,'" since Tyson had exported more pork to China in April 2020 than in any month since January 2017—the same month Defendant J. Tyson warned in several full-page advertisements that the American "food supply chain is breaking."

64.    The SEC also increased its scrutiny of statements related to the pandemic. On December 4, 2020, in an announcement making the first charges for misleading disclosures about the impact of the COVID-19 pandemic on its business operations and financial condition that, Stephanie Avakian, Director of the Division of Enforcement, stated: "The Enforcement Division, including the Coronavirus Steering Committee, will continue to scrutinize COVID-related disclosures to ensure that investors receive accurate, timely information, while also giving appropriate credit for prompt and substantial cooperation in investigations."[28]

### THE FALSE AND MISLEADING STATEMENTS

65.    On March 13, 2020, the Company published a Form 8-K current report supplementing risk factors disclosed in its annual report filed for the year ended September 28, 2019.  The Company noted the "rapidly evolving coronavirus (COVID-19) outbreak" as an additional risk factor:

> "Pandemics or disease outbreaks, such as the novel coronavirus (COVID-19 virus), *may disrupt consumption and trade patterns, supply chains, and production processes*, which could materially affect our operations and results of operations.

> Pandemics or disease outbreaks such as the novel coronavirus (COVID-19 virus) *may depress demand for protein* because quarantines may inhibit consumption.

* * *

---

[28]    SEC Charges The Cheesecake Factory For Misleading COVID-19 Disclosures (Dec. 4, 2020), https://www.sec.gov/news/press-release/2020-306. Last visited February 25, 2021.

***Our operations***, or those of independent contract poultry producers and producers who provide the live animals to our production operations, ***may become limited in their ability to procure, deliver, or produce our food products*** because of transport restrictions related to quarantines or travel bans.

***Workforce limitations and travel restrictions resulting from pandemics or disease outbreaks and related government actions may impact many aspects of our business***. [Emphasis added].

66.     On May 4, 2020, the Company filed a Form 10-Q for the fiscal quarter ended March 28, 2020 (the "2Q 2020 10-Q").  Attached to the 2Q 2020 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants White and Glendinning attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

67.     The 2Q 2020 10-Q stated the following concerning the Company's response to the coronavirus pandemic:

"COVID-19 – We are monitoring and responding to the evolving nature of the global novel coronavirus pandemic ("COVID-19" or "pandemic") and its impact to our global business. ***We formed an internal COVID-19 task force for the primary purposes of maintaining the health and safety of our team members, ensuring our ability to operate our processing facilities and maintaining the liquidity of our business***.

\* \* \*

Team Members – ***The health and safety of our team members is our top priority***. To protect our team members, we implement safety measures recommended by the Centers for Disease Control and Prevention ("CDC") and the Occupational Safety and Health Administration ("OSHA") in our facilities and coordinate with other health officials as appropriate, including, but not limited to, checking the temperature of team members as they enter company facilities, restricting visitor access, increasing efforts to deep clean and sanitize facilities, ***requiring the use of protective face coverings and making protective face coverings and other protective equipment available to team members, and encouraging team members who feel sick to stay at home through relaxed attendance policies and enhanced benefits***. We continue to explore and implement additional ways to ***promote social distancing in our production facilities*** by creating additional breakroom space and allowing extra time between shifts to reduce interaction of Team members, as well

as erecting dividers between workstations or increasing the space between workers on the production floor."  [Emphasis added].

68.     On August 3, 2020, the Company filed a Form 10-Q for the fiscal quarter ended June 27, 2020 (the "3Q 2020 10-Q").  Attached to the 3Q 2020 10-Q were SOX certifications signed by Defendants White and Glendinning attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

69.     The 3Q 2020 10-Q stated the following, concerning the Company's response to COVID-19:

> "COVID-19 We continue to monitor and respond to the evolving nature of the global novel coronavirus pandemic ("COVID-19" or "pandemic") and its impact to our global business.  *We formed an internal COVID-19 task force for the primary purposes of maintaining the health and safety of our team members, ensuring our ability to operate our processing facilities and maintaining the liquidity of our business*.
>
> * * *
>
> Team Members – *The health and safety of our team members is our top priority*. To protect our team members, we implement safety measures recommended by the Centers for Disease Control and Prevention ("CDC") and the Occupational Safety and Health Administration ("OSHA") in our facilities and coordinate with other health officials as appropriate, including, but not limited to, checking the temperature of team members as they enter company facilities, restricting visitor access, increasing efforts to deep clean and sanitize facilities, *requiring the use of protective face coverings and making protective face coverings and other protective equipment available to team members, and encouraging team members who feel sick to stay at home through relaxed attendance policies and enhanced benefits*. We implemented additional ways to *promote social distancing in our production facilities by creating additional breakroom space* and allowing extra time between shifts to reduce interaction of team members, as well as erecting dividers between workstations or increasing the space between workers on the production floor."
> (Emphasis added.)

70.     On November 16, 2020, the Company filed a Form 10-K for the fiscal year ended October 3, 2020 (the "2020 10-K").  Attached to the 2020 10-K were SOX certifications signed

by Defendants Bank and Glendinning attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

71.    The 2020 10-K stated the following, in relevant part, concerning the Company's response to the coronavirus:

"Health and Safety: We maintain a safety culture grounded on the premise of eliminating workplace incidents, risks and hazards. We have created and implemented processes to help eliminate safety events by reducing their frequency and severity. We also review and monitor our performance closely. Our goal is to reduce Occupational Safety and Health Administration ("OSHA") recordable incidents by 10% year over year. During fiscal 2020, our recordable incident rate declined 17% compared to fiscal 2019. *In response to the global novel coronavirus pandemic ("COVID-19" or "pandemic"), we have implemented and continue to implement safety measures in all our facilities*. As an expansion of our We Care workplace safety program and continued efforts to boost the overall health and wellness of our workforce, we are piloting health clinics near our production facilities, giving team members and their families easier access to high-quality healthcare.

\* \* \*

COVID-19 We continue to monitor and respond to the evolving nature of COVID-19 and its impact to our global business. *We formed an internal COVID-19 task force for the primary purposes of maintaining the health and safety of our team members, ensuring our ability to operate our processing facilities and maintaining the liquidity of our business*.

\* \* \*

Team Members – *The health and safety of our team members is our top priority*. To protect our team members, we have implemented and will continue to implement safety measures recommended by the Centers for Disease Control and Prevention ("CDC") and the Occupational Safety and Health Administration ("OSHA") in our facilities and coordinate with other health officials as appropriate, including, but not limited to, checking the temperature of team members as they enter company facilities, restricting visitor access, increasing efforts to deep clean and sanitize facilities, *requiring the use of protective face coverings and making protective face coverings and other protective equipment available to team members and encouraging team members who feel sick to stay at home through relaxed attendance policies and enhanced benefit*s. We implemented additional ways to promote social distancing in our production facilities by creating additional

breakroom space and allowing extra time between shifts to reduce interaction of team members, as well as erecting dividers between workstations or increasing the space between workers on the production floor.

* * *

***Governmental authorities at the federal, state and local levels may increase or impose new or stricter social distancing directives, stay-at-home restrictions, travel bans, quarantines, workforce and workplace restrictions or other measures related to COVID-19. Such actions could cause us to continue to incur additional costs.***" [Emphasis added].

72.    The statements referenced in ¶¶ 65-71 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them.  Specifically, the Company made false and/or misleading statements and/or failed to disclose that: (a) Tyson knew, or should have known, that the highly contagious coronavirus was spreading throughout the globe; (b) Tyson did not in fact have sufficient safety protocols to protect its employees in its facilities; (c) as a result, Tyson employees contracted and spread the coronavirus within the facilities; (d) as a result of the foregoing, Tyson would face negative impact to its production, including complete shutdowns of certain facilities; (e) due to the failure to protect its employees, Tyson would suffer financial harm related to its lowered production; and (f) as a result, the public statements were materially false and/or misleading at all relevant times.

73.    Further, the Company failed to maintain even the most basic preventive measures and did not tell workers when their colleagues tested positive for COVID-19.  Instead, during the Relevant Period, the Company exposed its employees' health and lives and took minimal precautions to prevent the outbreak of COVID-19 at its facilities, including by: (a) allowing workers to wear unprotective face coverings such as bandanas and sleep masks; (b) failing to

implement social distancing, despite enforcing plastic sheet dividers between elbow-to-elbow workers, which was widely known to be ineffective; (c) misleading employees about the severity of the health risks; (d) disincentivized from taking sick leave; and (e) failing to prevent overcrowding in employee bathroom facilities (the "COVID-19 Working Condition Misconduct"). As a result, the Company suffered from massive viral outbreaks at its plants, forcing the Company to temporarily close certain facilities—negatively effecting not only the health of its workers, but also its production. According to later reports on the Company, by the end of the year in 2020, the Company had triple the amount of COVID-19 cases and twice as many related deaths compared to other companies operating in the meat packing industry, making it the Company with the highest cases in the industry.

## THE TRUTH EMERGES

74. On December 15, 2020, New York City Comptroller Scott M. Stringer ("Comptroller Stringer") called on the SEC to open an investigation into the Company. In his letter to the SEC, Comptroller Stringer described, in relevant part, the Company's various failures to carry out its stated coronavirus protection policies:

> Unfortunately, **the steps Tyson eventually took to protect employees were grudging and minimal, such as letting workers use bandanas or sleep masks, which function poorly as protective devices. Tyson never moved workers six feet apart throughout the plant, nor did it slow the assembly line so that workers could be socially distanced. The Company did hang plastic sheeting between workers as they continued to work elbow to elbow, even though the Centers for Disease Control and Prevention ("CDC") told the industry that plastic sheeting does not work unless workers are at least six feet apart.**
>
> As COVID-19 was infecting its employees, **Tyson reportedly misled its workforce in its largest pork plant** by telling them that "everything is fine." **Eventually over 1000 workers in that plant tested positive, leading to worker deaths, hospitalizations, and plant closure**.
>
> **Tyson's sick leave policy was similarly limited**. As COVID-19 swept through its plants, in a nod to the CDC guidance that sick workers must stay home, **Tyson**

*paused its policy of penalizing workers who called in sick for a few months*. However, it appears that *Tyson then proceeded to undermine that policy*. In April, employees were incentivized to continue working via a $500 "thank you" bonus promised to workers who showed up for every scheduled shift over a three month period. Then *in June, Tyson reinstated its policy penalizing workers who take sick leave to avoid contact with any exposed workers*.

Other steps were similarly limited. *Tyson only reluctantly built some outdoor break rooms in a few plants to prevent workers from crowding into break rooms. Workers had to continue crowding into bathrooms, and many never got time to even visit a bathroom once a day*.

Tyson's tardy and limited reaction took a serious human toll. A report by the nonprofit Food Environment Reporting Network has tracked COVID-19 outbreak in the meatpacking industry (as well as the food processing and farm sectors) and reports that *as of December 3, 2020 Tyson has the highest number of COVID-19 cases of any company in the meatpacking industry, more than three times as many cases as the next company* (11,087 vs. 3,026 cases at JBS, the nation's largest meatpacking company). *Tyson reported twice as many deaths as any other meatpacking company*. Recent research data demonstrate that Tyson and other companies in the meatpacking industry are uniquely vulnerable to COVID-19 outbreaks. A November 2020 article published under the aegis of the National Academy of Sciences estimated that livestock plants were associated with 236,000 to 310,000 COVID-19 cases (6 to 8% of total) and 4,300 to 5,200 deaths (3 to 4% of total) as of July 21, 2020.  [Emphasis added].

75.     On this news, the price of the Company shares fell $1.78 per share, or 2.5%, to close at $68.25 per share on December 15, 2020.

## DAMAGES TO THE COMPANY

76.     As a direct and proximate result of Defendants' conduct, the Company will lose and expend many millions of dollars.

77.     Such expenditures include, but are not limited to, legal fees and payments associated with the numerous lawsuits and other actions lodged against the Company as a result of the misconduct discussed herein including the wrongful death actions discussed above, the Holder Investigation, inquiries by Senators Warren and Booker, the Securities Class Action possible investigation by the SEC, and amounts paid to outside lawyers, accountants, and

investigators in connection thereto.

78.     In addition, these losses include, but are not limited to, lavish compensation and benefits paid to Defendants who breached their fiduciary duties to the Company.

79.     As a direct and proximate result of Defendants' conduct, the Company has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

146.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of Defendants' violations of Sections 10(b) and 21D of the Exchange Act, and their breaches of fiduciary duties and other wrongful conduct as alleged herein and that occurred during the Relevant Period.

147.     Plaintiff will adequately and fairly represent the interests of Tyson in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

148.     Plaintiff is a current owner of the Company stock and has been an owner of Company stock during the Relevant Period.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

149.     Because of the facts set forth herein, Plaintiff has not made a demand on the Board of the Company to institute this action against the Director Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

150.    At the time this suit was filed, the Board was comprised of fourteen (14) members -- J. Tyson, B. Tyson, Banks, White, Bronczek, Baledge, Banister, Beebe, Durham, Mariner, McNamara, Miller, Schomburger and Thurber.  Thus, Plaintiff is required to show that a majority of Defendants, *i.e.*, seven (7), could not exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

151.    The Director Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning the information described herein.  Because of their advisory, executive, managerial, and directorial positions with the Company, the Director Defendants had knowledge of material non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

152.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

153.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this Complaint, Plaintiff did not make (and was excused from making) a pre-filing demand on the Board to initiate this action because making a demand would have been a futile and useless act.

154.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

155.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

156.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

## THE DIRECTOR DEFENDANTS WERE NOT INDEPENDENT

**Defendant White**

157.    Defendant White served as the Company's CEO during the Relevant Period and currently serves as the Executive Vice Chairman of the Board.  As the Company admits, Defendant White is a non-independent director.  The Company provides Defendant White with his principal occupation, and he receives handsome compensation, including $10,993,649 in 2020 for his services.  Defendant White was responsible for most of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings referenced herein, many of which he either personally made or signed off on, including the 2020 10-K and 2Q20 10-Q.

158.    Further, Defendant White is a defendant in the securities class action entitled *Guo v. Tyson Foods, Inc., et al.*, Case No.: Case 1:21-cv-00552 (N.D. Cal.) ("Securities Class Action).

**Defendant Banks**

159.    Since October 2020, Defendant Banks has served as the President and CEO of the Company.  Defendant Banks also has served as a Company director since 2017.  As the Company

admits, Defendant Banks is a non-independent director. Defendant Banks has received and continues to receive compensation for his role as described above. As the Company's highest officer since October 2020, and as a trusted Company director, Defendant Banks conducted little, if any, oversight of the Company's participation in the COVID-19 Working Condition Misconduct and the scheme to make false and misleading statements, disregarded his duties to monitor such controls over reporting and engagement in the schemes, and disregarded his duties to protect corporate assets. In addition, Defendant Banks signed, and thus personally made the false and misleading statements in the Company's 2020 10-K.

160.    Defendant Banks is a defendant in the Securities Class Action.

**Defendant J. Tyson**

161.    Defendant Tyson serves as the Company's Chairman and has been a Company director since 1984. Defendant J. Tyson is the grandson of the founder of the Company, has been part of the Company since he was a teenager, and has worked in almost every department. Defendant J. Tyson also has a substantial personal and financial interest in the Company through his association with the Tyson Limited Partnership, the Company's controlling shareholder, and his individual shareholding interests. Defendant J. Tyson also helped to develop the Company's "Core Values." The Company admits that he is a non-independent director.

162.    The Company provides Defendant J. Tyson with his principal occupation, and he receives compensation, including $11,219,289 in fiscal year 2020 for his services. Furthermore, Defendant J. Tyson signed, and thus personally made the false and misleading statements in the 2020 10-K. Defendant J. Tyson also authored the advertisements in major newspapers warning of risks to the American food supply amidst the pandemic. As a trusted Company director, he conducted little, if any, oversight of the COVID-19 Working Condition Misconduct and the

scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

**Defendant Baledge**

163.    Defendant Baledge has served as a Company director since 2020. Defendant Baledge has received and continues to receive compensation for his roles with the Company. As a trusted Company officer and director, he conducted little, if any, oversight of the Company's participation in the COVID-19 Working Condition Misconduct and the scheme to make false and misleading statements, disregarded his duties to monitor such controls over reporting and engagement in the schemes, and disregarded his duties to protect corporate assets.  Defendant Baledge also signed, and thus personally made the false and misleading statements in the 2020 10-K.

**Defendant Banister**

164.    Defendant Banister has served as a Company director since 2011. Defendant Banister has received and continues to receive compensation for his roles with the Company.  As a trusted Company director, Defendant Banister conducted little, if any, oversight of the Company's participation in the COVID-19 Working Condition Misconduct and the scheme to make false and misleading statements, disregarded his duties to monitor such controls over reporting and engagement in the schemes, and disregarded his duties to protect corporate assets. Furthermore, Defendant Banister signed, and personally made the false and misleading statements in the 2020 10-K.

**Defendant Beebe**

165.   Defendant Beebe has served as a Company director since 2015.  Defendant Beebe has received and continues to receive compensation for his role as a director.  As a trusted Company director, Defendant Beebe conducted little, if any, oversight of the Company's participation in the COVID-19 Working Condition Misconduct and the scheme to make false and misleading statements, disregarded his duties to monitor such controls over reporting and engagement in the schemes, and disregarded his duties to protect corporate assets.  Furthermore, Defendant Beebe signed, and personally made the false and misleading statements in the 2020 10-K.

**Defendant Bronczek**

166.   Defendant Bronczek has served as a Company director since 2020.  Defendant Bronczek has received and continues to receive compensation for his role as a director.  As a trusted Company director, Defendant Bronczek conducted little, if any, oversight of the Company's participation in the COVID-19 Working Condition Misconduct and the scheme to make false and misleading statements, disregarded his duties to monitor such controls over reporting and engagement in the schemes, and disregarded his duties to protect corporate assets.

**Defendant Durham**

167.   Durham has served as a Company director since 2015.  Defendant Durham has received and continues to receive compensation for her role as a director.  As a trusted Company director, Defendant Durham conducted little, if any, oversight of the Company's participation in the COVID-19 Working Condition Misconduct and the scheme to make false and misleading statements, disregarded her duties to monitor such controls over reporting and engagement in the schemes, and disregarded her duties to protect corporate assets.  In addition, Defendant Durham signed, and made the false and misleading statements in the 2020 10-K.

**Defendant Mariner**

168.   Defendant Mariner has served as a Company director since 2019. Defendant Mariner has received and continues to receive compensation for his role as a director.  As a trusted Company director, Defendant Mariner conducted little, if any, oversight of the Company's participation in the COVID-19 Working Condition Misconduct and the scheme to make false and misleading statements, disregarded his duties to monitor such controls over reporting and engagement in the schemes, and disregarded his duties to protect corporate assets.  In addition, Defendant Mariner signed, and made the false and misleading statements in the 2020 10-K.

**Defendant McNamara**

169.   Defendant McNamara has served as a Company director since 2007. Defendant McNamara has received and continues to receive compensation for his role as a director.  As a trusted Company director, Defendant McNamara conducted little, if any, oversight of the Company's participation in the COVID-19 Working Condition Misconduct and the scheme to make false and misleading statements, disregarded his duties to monitor such controls over reporting and engagement in the schemes, and disregarded his duties to protect corporate assets. Furthermore, Defendant McNamara signed, and thus personally made the false and misleading statements in the 2020 10-K.

**Defendant Miller**

170.   Defendant Miller has served as a Company director since 2016.  Defendant Miller has received and continues to receive compensation for her role as a director.  As a trusted Company director, Defendant Miller conducted little, if any, oversight of the Company's participation in the COVID-19 Working Condition Misconduct and the scheme to make false and

misleading statements, disregarded her duties to monitor such controls over reporting and engagement in the schemes, and disregarded her duties to protect corporate assets.

**Defendant Schomburger**

171.    Defendant Schomburger has served as a Company director since 2016.  Defendant Schomburger has received and continues to receive compensation for his roles with the Company. As a trusted Company officer and director, Defendant Schomburger conducted little, if any, oversight of the Company's participation in the COVID-19 Working Condition Misconduct and the scheme to make false and misleading statements, disregarded his duties to monitor such controls over reporting and engagement in the schemes, and disregarded his duties to protect corporate assets.  Furthermore, Defendant Schomburger signed, and thus personally made the false and misleading statements in the 2020 10-K.

**Defendant Thurber**

172.    Defendant Thurber has served as a Company director since 2009.  Defendant Thurber has received and continues to receive compensation for his role as a director.  As a trusted Company director, Defendant Thurber conducted little, if any, oversight of the Company's participation in the COVID-19 Working Condition Misconduct and the scheme to make false and misleading statements, disregarded his duties to monitor such controls over reporting and engagement in the schemes, and disregarded his duties to protect corporate assets.  In addition, Defendant Thurber signed, and thus personally made the false and misleading statements in the 2020 10-K.

**Defendants Beebe, Mariner, McNamara and Miller**

173.    Defendants Beebe, Mariner, McNamara and Miller served as members of the Audit Committee during the Relevant Period.  Pursuant to the Audit Committee Charter, the Audit

Committee Defendants were responsible for, *inter alia*, the effectiveness of the Company's internal controls, the integrity of its financial statements, and aspects of risk management and legal and regulatory compliance that may affect the Company's financial reporting. Defendants Beebe, Mariner, McNamara and Miller failed to ensure the integrity of the Company's internal controls, as they are charged to do under the Audit Committee Charter, allowing the Company to participate in the COVID-19 Working Condition Misconduct, and to issue false and misleading financial statements with the SEC. Thus, Defendants Beebe, Mariner, McNamara and Miller breached their fiduciary duties, are not disinterested, and demand is excused as to them.

## COUNT I

### (Against Defendants White, Banks, and Glendinning for Violations of Sections 10(b) and 21D Of The Exchange Act)

174.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

175.    The Company, along with Defendants White, Banks, and Glendinning are named as defendants in the Securities Class Action, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of law, the Company's liability will be in whole or in part due to Defendants White, Banks, and Glendinning's willful and/or reckless violations of their obligations as officers and directors of the Company.

176.    Through their positions of control and authority as officers of the Company, Defendants White, Banks, and Glendinning were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts described in the Securities Class Action and herein.

177.    As such, Defendants White, Banks, and Glendinning are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

## COUNT III

### (Against the Director Defendants for Breach of Fiduciary Duty)

178.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

179.    The Director Defendants owed the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

180.    The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

181.    The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to estimate its reserves set aside for annuity and pension payments, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

182.    As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

183.    As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending and/or settling securities lawsuits and governmental investigations, severe damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT IV

### (Against the Director Defendants for Waste of Corporate Assets)

184.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

185.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

186.    As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (a) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (b) awarding self-interested stock options to certain officers and directors; and (c) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle actions addressing Defendants' unlawful actions.

187.    As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

188.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(A)    Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

(B)    Finding Defendants liable for breaching their fiduciary duties owed to the Company;

(C)    Directing Defendants to take all necessary actions to reform and improve the Company's corporate governance, risk management, and internal operating procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the rampant wrongful conduct described herein;

(D)    Awarding damages to the Company for the harm the Company suffered as a result of the Defendants' wrongful conduct;

(E)    Awarding damages to the Company for Defendants White, Banks, and Glendinning's violations of Sections 10(b) and 21D of the Exchange Act;

(F)    Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

(G)    Awarding such other and further relief as is just and equitable.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: February 26, 2021

**GAINEY McKENNA & EGLESTON**

By: */s/ Gregory M. Egleston*
   Gregory M. Egleston
Thomas J. McKenna
501 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: gegleston@gme-law.com
Email: tjmckenna@gme-law.com

*Attorneys for Plaintiff*

## <u>VERIFICATION</u>

I, MICHELLE WOLKOMIR, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Tyson Foods, Inc. ("Tyson") and authorize its filing.   I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true.  I further declare that I am a current holder, and have been a holder, of Tyson as set forth in the Complaint.

Executed this   24th   day of February 2021.


_____
MICHELLE WOLKOMIR